T.C. Summary Opinion 2012-45

UNITED STATES TAX COURT

TERRY D. BELL AND ANNETTE R. BELL, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 26228-09SL.                    Filed May 16, 2012.

Terry D. Bell and Annette R. Bell, for themselves.

<u>Dennis R. Onnen</u>, for respondent.

SUMMARY OPINION

MORRISON, <u>Judge</u>:  This case was heard pursuant to the provisions of

section 7463 of the Internal Revenue Code in effect at the time the petition was

filed.  Pursuant to section 7463(b), the decision to be entered is not reviewable by

any other court, and this opinion shall not be treated as precedent for any other case.

Subsequent section references are to the Internal Revenue Code. The petitioners, Terry D. Bell and Annette R. Bell, seek this Court's review pursuant to section 6330(d)(1) of a supplemental determination by the IRS Office of Appeals to sustain a notice of intent to levy in order to collect the Bells' unpaid federal income tax for the tax year 2005. As part of this supplemental determination, the Office of Appeals rejected the Bells' proposal to pay $4,800 as an offer-in-compromise for their unpaid federal income taxes for the tax years 2005, 2006, and 2009. The supplemental determination was made after the Office of Appeals had conducted a collection-review hearing pursuant to section 6330(c) and a supplemental collection-review hearing pursuant to a remand by this Court. We hold that the Office of Appeals did not abuse its discretion by rejecting the Bells' offer-in-compromise and sustaining the levy action.

## Background

At the time they filed the petition, the Bells were residents of Kansas. Mr. Bell is a self-employed exterminator. Mrs. Bell is a self-employed hair stylist.

On or before April 15, 2006, the Bells filed their federal income-tax return for 2005. They reported a liability of $360.

After sending the Bells a statutory notice of deficiency for 2005, and after the Bells did not file a Tax Court petition responding to the notice, the IRS

assessed a deficiency as a result of the imposition of an additional tax under section 72(t) of $12,880, interest of $2,617, and a section 6662 penalty of $2,595.66 on October 6, 2008.

On March 2, 2009, the IRS sent a notice to the Bells stating that it intended to levy to collect the liabilities associated with their 2005 income tax.

On March 25, 2009, the Bells requested a collection-review hearing with the IRS Office of Appeals. They indicated that they wanted the Office of Appeals to consider an offer-in-compromise and "many issues".

Even though the Bells live in Kansas, the Office of Appeals assigned the hearing to Settlement Officer Lorraine O'Shaughnessy of the IRS Brookhaven Campus--Corporate Appeals Office in Holtsville, New York. On July 10, 2009, O'Shaughnessy wrote a letter to the Bells acknowledging that she had received their case. On July 30, 2009, she wrote a letter scheduling a telephone conference with the Bells for September 8, 2009. She requested that the Bells call her at noon eastern time on that day. She explained that if the Bells preferred instead to have a face-to-face conference at the Office of Appeals location closest to their residence, they should notify her within 14 days. According to O'Shaughnessy's letter, the telephone conference on September 8, 2009, was to be the Bells' "primary opportunity" to discuss their reasons for disagreeing with the collection action or

to discuss alternatives to the collection action. The Bells did not call O'Shaughnessy on September 8, 2009. They erroneously believed that O'Shaughnessy would call them. Mr. Bell called O'Shaughnessy on September 14, 2009, and left her a voicemail message. Although O'Shaughnessy returned Mr. Bell's call the next day and spoke with Mr. Bell at other times, she refused to reschedule the original telephone conference. She did not have a face-to-face meeting with the Bells.

On October 7, 2009, Settlement Officer O'Shaughnessy issued a notice of determination sustaining the levy action. The notice of determination stated that although the Bells had disagreed with the amount of the assessment they were barred from disagreeing with it because they had had a prior opportunity to dispute it. The notice also stated that the Bells had declined to request a face-to-face conference at the Office of Appeals location closest to their residence.

On or about November 4, 2009, the Bells filed a petition with the Tax Court to challenge the notice of determination. Their petition appears to seek a review of the amount of their liability for 2005. The Court scheduled their case to be tried during the week of June 7, 2010.

During trial preparations an apparent defect in the conduct of the hearing was discovered by the respondent, whom we refer to here as the IRS. On May 4,

2010, the IRS filed a motion to remand the case to the Office of Appeals on the grounds that the Bells were entitled to a face-to-face hearing at the Office of Appeals location in Oklahoma City, Oklahoma. The motion asserted that the Bells had requested a face-to-face hearing at the Office of Appeals location closest to their residence. The motion also alleged that the Bells received "statutory notices of deficiency" for 2005 and that they did not petition the Tax Court. The Bells did not object to the motion.

On May 11, 2010, the Court granted the IRS's motion to remand.

Settlement Officer Scott Penny in Oklahoma City, Oklahoma, was assigned by the Office of Appeals to handle the Bells' case on remand.

On June 9, 2010, Penny sent a letter to the Bells scheduling a face-to-face conference for July 7, 2010. The letter also requested that within 14 days the Bells provide Penny with their bank statements for the last six months.

On July 7, 2010, a face-to-face conference occurred between the Bells and Settlement Officer Penny in Oklahoma City. According to Penny's notes the Bells did not contest their liability. The Bells discussed an offer-in-compromise whereby they would make a lump-sum payment of $4,800. It is not clear what liabilities would be compromised, but the offer-in-compromise later submitted by the Bells to the IRS on August 16, 2010, was to compromise

liabilities for the 2005, 2006, and 2009 tax years. Neither party has explained why all three years were apparently under discussion. Mr. Bell provided some bank records to Penny at the conference. It is not clear exactly what bank records were provided. The Bells had three bank accounts during 2010: (1) Mr. Bell's account at Commerce Bank, (2) the Bells' joint account at Commerce Bank, and (3) Mrs. Bell's account at the Bank of Kansas. Penny would eventually collect in his files statements for all three bank accounts.

On July 9, 2010, Settlement Officer Penny wrote a letter to the Bells explaining that the documents he received from them at the face-to-face-conference were insufficient to allow him to consider an offer-in-compromise. He requested, among other things, "Copies of bank statements from the Bank of Kansas for the last six months of 2010, excluding the statement ending May 26, 2010 as you provided this statement during the Hearing." Because May 2010 is not one of the last six months of 2010, and because bank statements for the last six months of 2010 did not yet exist when Penny made this request, the Bells must have been confused by this request.

On August 3, 2010, Settlement Officer Penny wrote a letter to the Bells acknowledging that he had received a packet of documents from them (none of which were bank statements), and stating that the documents he had were still

insufficient to allow him to consider an offer-in-compromise. Penny requested again, among other things, "Copies of bank statements from the Bank of Kansas for the last six months of 2010, excluding the statement ending May 26, 2010 as you provided this statement during the Hearing."

On August 16, 2010, the Bells submitted to Settlement Officer Penny an offer-in-compromise for the 2005, 2006 and 2009, tax years, offering to pay $4,800 in a lump sum. Penny forwarded the offer to the IRS Centralized Offer in Compromise Unit in Holtsville, New York, for consideration.

On September 12, 2010, the Centralized Offer in Compromise Unit sent a letter to the Bells requesting information, including statements for all their bank accounts for "the last three, consecutive months." The letter requested that the information be sent within 30 days. The Bells did not respond to the letter. On November 8, 2010, the Centralized Offer in Compromise Unit informed the Bells that it could not consider the Bells' offer because it had not received all the required information. The Centralized Offer in Compromise Unit returned the case to Settlement Officer Penny.

On November 19, 2010, Settlement Officer Penny sent a letter to the Bells stating that he preliminarily estimated that the Bells had the ability to pay $1,809.32 per month towards their 2005, 2006, and 2009 tax liabilities. This

estimate was based on his calculation that the average deposits into the Bells' three bank accounts were $7,456.12 per month, his estimate that their income was also $7,456.12 per month, and his estimate that the Bells' monthly expenses were $5,646.80.  By this time Penny had apparently received some bank statements for all three of the Bells' bank accounts.  He used the following bank statements in calculating the average monthly deposits:

- eight months of bank statements (December 2009 through July 2010) from Mr. Bell's bank account at Commerce Bank;

- six months of bank statements (January 2010 through July 2010; except for June 2010) from the Bells' joint bank account at Commerce Bank; and

- two months of bank statements (May 2010 and July 2010) from Mrs. Bells' bank account at Bank of Kansas.

The letter requested further information from the Bells, including "Copies of bank statements from the Bank of Kansas for the last six months of 2010, excluding the statement ending May 26, 2010 and July 28, 2010 as you have previously provided these statements."  The letter stated:  "The total bank deposits for all three bank statements exceed the amount of income reported on prior years tax returns.  Why?  Please document your position."

On January 7, 2011, Settlement Officer Penny spoke with Mr. Bell over the telephone.  Penny explained that he did not understand why the deposits from the three bank accounts averaged approximately $7,500 per month.  Mr. Bell said he did not know why the monthly deposits for the three accounts averaged $7,500, but said that the joint account at Commerce Bank was closed.  Penny asked Mr. Bell for statements for the Bank of Kansas account for June, August, September, and October 2010.  At some point the Bells must have provided these statements to Penny, because Penny's March 7, 2011 calculations (and perhaps his February 18, 2011 calculations) used the information in the statements.

On January 21, 2011, Settlement Officer Penny wrote a letter to the Bells indicating that he did not understand why their bank deposits were so high.  He said:

> My main concern is your income as depicted in the bank deposits and your expenses.  You will need to provide the following items to help me better understand your situation in hopes of getting to a viable offer amount:
>
>     \*     \*     \*     \*     \*     \*     \*
>
> The bank statements you provided reflect an average combined monthly deposit in the amount of $7,456.00 for the 2010 tax year.  I previously asked you why the deposits were greater then [sic] what you claimed in income.  Your response was that the third bank account had been closed.  The closing of the bank account does not eliminate the income.  You will need to explain why the average

deposits are greater than the income you are reporting. You also need to provide documentation supporting your explanation, i.e. additional bank statements, income statement for 2010, etc. At this time your monthly income is based on you [sic] monthly deposit average, which is $7,456.00.

He also stated:

Provide me complete copies of the last two bank statements that reflected banking activity for the [Bells' joint bank account at Commerce Bank].

By February 18, 2011, Settlement Officer Penny had prepared a supplemental determination that the Bells' $4,800 offer-in-compromise should be rejected because he believed their monthly income was sufficient to allow them to pay off their 2005, 2006, and 2009 tax liabilities. Penny sent the supplemental determination to his supervisor for approval.

On February 24, 2011, Settlement Officer Penny noted in his records that he received from the Bells "two bank statements for Commerce Bank". We surmise that these two statements were the October and November 2010 statements from the joint account at Commerce Bank. (On January 21, 2011, Penny had asked the Bells for the last two active bank statements for the joint account at Commerce Bank.) Penny noted in his records that the two additional bank statements did not "change the outcome of the OIC."

On March 7, 2011, the Office of Appeals issued the supplemental notice of determination sustaining the levy. The notice stated that the $4,800 offer-in-compromise was rejected because the Bells could pay off all their tax liabilities in monthly payments. The notice stated that the tax liabilities to be compromised were $48,623.67 ($22,883.93 of liabilities for 2005, $25,594.27 of liabilities for 2006, and $145.47 of liabilities for 2009), that this sum would be paid off if the Bells made monthly payments of $600, and that the Bells were capable of making payments of $1,782 per month. The $1,782 estimate of the amount the Bells could pay each month was the difference between (1) estimated monthly income of $7,492 and (2) estimated monthly expenses of $5,710. The $7,492 monthly income estimate was equal to an estimate of the monthly deposits into the Bells' three bank accounts. Penny used the following bank statements in making this estimate:

- eight months of bank statements (December 2009 through July 2010) from Mr. Bell's bank account at Commerce Bank;

- six months of bank statements (January 2010 through July 2010; except for June 2010) from the Bells' joint bank account at Commerce Bank; and

• five months of bank statements (May 2010 through October 2010, except June 2010) from Mrs. Bells' bank account at Bank of Kansas.

Thus, Penny used three more Bank of Kansas statements to make his monthly estimate than he used to make his monthly estimate on November 19, 2010, which explains why the two estimates are different. The record does not directly explain why Penny did not use the October and November 2010 statements from the joint account at Commerce Bank, except that, as mentioned earlier, Penny's notes suggest that he determined that he would have rejected the offer-in-compromise anyway even if he had incorporated the information in the two statements into his calculations.

## Discussion

When a taxpayer fails to pay any federal tax liability within 10 days of notice and demand for payment, the IRS may collect the unpaid tax by levy on the taxpayer's property pursuant to section 6331. Before the IRS may proceed with that levy, the taxpayer is entitled to administrative review pursuant to section 6330. Administrative review is carried out through a hearing before the IRS Office of Appeals. Sec. 6330(b). The pertinent procedures for this collection-review hearing are set forth in section 6330(c).

First, the Office of Appeals must obtain verification from the Treasury Secretary that the requirements of any applicable law or administrative procedure have been met. Sec. 6330(c)(1). Second, the taxpayer may "raise at the hearing any relevant issue relating to the unpaid tax or the proposed levy", including challenges to the appropriateness of the collection action and offers of collection alternatives. Sec. 6330(c)(2)(A). The taxpayer may contest the existence and amount of the underlying tax liability, but only if the taxpayer did not receive a notice of deficiency and "did not otherwise have an opportunity to dispute such tax liability." Sec. 6330(c)(2)(B); Baltic v. Commissioner, 129 T.C. 178, 180-181 (2007); Oyer v. Commissioner, T.C. Memo. 2003-178, slip op. at 15-17 (both conditions must be met), aff'd, 97 Fed. Appx. 68 (4th Cir. 2004).

After the Office of Appeals has issued its determination, the taxpayer may appeal the determination to the Tax Court, pursuant to section 6330(d)(1), as the Bells have done. In such an appeal, we review de novo any determination of the Office of Appeals as to the underlying liability that is properly at issue. Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). As to other matters, we review the determination of the Office of Appeals for abuse of discretion--that is, we decide whether the determination was arbitrary, capricious, or without sound basis in fact or law. Murphy v.

Commissioner, 125 T.C. 301, 320 (2005) (reviewing rejection of offer-in-compromise by Office of Appeals), aff'd, 469 F.3d 27 (1st Cir. 2006); Sego v. Commissioner, 114 T.C. at 610; Goza v. Commissioner, 114 T.C. at 182.

The Bells make three contentions as to why we should not sustain the determination of the Appeals Office: (1) Settlement Officer Penny should have considered the correctness of the amount of their 2005 liability at the supplemental hearing, (2) Settlement Officer O'Shaughnessy refused to reschedule their telephone conference, and (3) Settlement Officer Penny's estimate of average monthly income was flawed. We examine each contention in turn.

1.     The Bells' Challenge to the Amount of the Assessment

The Bells contend that they can still dispute the amount of the income-tax assessment for 2005 because, they say, they had always maintained that they disagreed with the amount of the assessment. Thus, while Settlement Officer Penny recorded in his notes that the Bells agreed not to contest their 2005 tax liability at their face-to-face meeting with him on July 7, 2010, the Bells argue that these notes are mistaken. But separate from the question of whether the Bells disputed their tax liability with the Office of Appeals is the question of whether the Bells received a notice of deficiency. If the Bells received a notice of deficiency, then they were barred from disputing the tax liability before the Office

of Appeals in the collection-review hearing. <u>See</u> sec. 6330(c)(2)(B). We are convinced they did receive a notice of deficiency. The notice of deficiency was sent to the address at which the Bells were living at the time. Mr. Bell, who testified at trial, did not deny receiving the notice of deficiency. Because the Bells received a notice of deficiency, they were barred from disputing their 2005 tax liability before the Office of Appeals in the collection-review hearing.

2.     O'Shaughnessy's Refusal To Reschedule the Telephone Conference

The Bells complain that Settlement Officer O'Shaughnessy did not reschedule the telephone conference that they missed. Their complaint potentially implicates the question of whether O'Shaughnessy's contacts with the Bells were sufficient to satisfy the requirement that the Office of Appeals hold a hearing. <u>See</u> sec. 6330(b)(1) (a "hearing shall be held by the Internal Revenue Service Office of Appeals"). However, it is unnecessary to consider whether O'Shaughnessy's contacts were sufficient to constitute a hearing. This is because, after we ordered the case remanded to the Office of Appeals, the Bells had a face-to-face meeting with Settlement Officer Penny. This meeting with Penny satisfied the requirement that the Office of Appeals hold a hearing.

3.      Alleged Errors in Penny's Estimate of the Bells' Monthly Income From Their Bank Deposits

Settlement Officer Penny estimated that the Bells' monthly income--before expenses--was equal to the average monthly deposits to their bank accounts during 2010.  The Bells contend that Penny's estimate was flawed in several ways.

a.      Deposits Allegedly Made of Money Previously Withdrawn

First, the Bells testified that they frequently withdrew money from one of their bank accounts and redeposited it shortly afterwards.  A deposit of money that had been withdrawn should not be counted as income.  However, the Bells failed to explain to Penny that they had engaged in a pattern of redepositing money that had earlier been withdrawn.  Penny had repeatedly asked the Bells to explain the amounts of their bank deposits.  The Bells refused to do so.

b.      Deposits Allegedly Made From Another Account

The Bells also argue that Settlement Officer Penny double counted their deposits as income because some deposits to one of their bank accounts consisted of transfers from one of their other bank accounts.  That some of the deposits were from another account was not apparent to Penny from the bank statements.  Penny concluded that none of the deposits were interaccount transfers.  The Bells did not testify which deposits were transfers between bank accounts.  More importantly,

despite Penny's repeated requests that the Bells explain the amounts of the bank deposits, the Bells did not provide Penny information showing that any of the deposits were transfers between bank accounts.

c.      Deposits Allegedly Made From Proceeds of Garage Sales

The Bells argue that some of the deposits reflected on the bank statements used by Settlement Officer Penny were the proceeds of garage sales. These deposits, they say, did not reflect income. Even if it were significant that some of the deposits were proceeds of garage sales, the Bells did not testify as to which deposits were attributable to garage sales. And, despite Penny's requests for the Bells to explain the amounts of the bank deposits, the Bells did not provide Penny any information regarding the garage sales.

d.      Deposits to Joint Account at Commerce Bank in Second Half of 2010

The Bells also argue that Penny erred in assuming that the deposits to their joint account at Commerce Bank would continue at the same rate in the last half of 2010 as in the first half of 2010. They claim that they stopped using the bank account regularly in the last half of the year.

Penny calculated that the Bells deposited an average of $7,492 per month to their bank accounts during 2010. The data Penny used to make this calculation is illustrated by the table below:

| Penny's calculations of monthly deposits | | | |
|---|---|---|---|
| Month | Eight monthly statements: Mr. Bell's account at Commerce Bank | Six monthly statements: the Bells' joint account at Commerce Bank | Five monthly statements: Mrs. Bell's account at Bank of Kansas |
| December 2009 | $3,404.78 | | |
| January 2010 | 1,156.68 | $3,654.85 | |
| February 2010 | 1,782.05 | 3,112.49 | |
| March 2010 | 1,868.61 | 3,277.27 | |
| April  2010 | 3,300.10 | 2,711.78 | |
| May 2010 | 2,064.81 | 600.00 | $2,896.41 |
| June 2010 | 2,047.62 | [1][0] | |
| July 2010 | 3,187.26 | 186.00 | 2,798.63 |
| August 2010 | | [0] | 3,337.97 |
| September 2010 | | [160] | 2,509.32 |
| October 2010 | | [0] | 2,874.81 |
| November 2010 | | [60.84] | |
| Total | [2]18,811.91 | 13,542.39 | 14,417.14 |
| Average monthly deposits (total $7,492) | $2,351.50 | [3]$2,257.10 | $2,883.43 |

[1]Amounts that are in brackets are derived from bank statements that were not considered by Penny.  The June, August, and September 2010, statements for the joint account with Commerce Bank were submitted by the Bells only at the trial and were not submitted to Penny.  The October 2010 and November 2010 statements were submitted to Penny but not included by him in his calculations of total deposits.

[2]Rounding this total to the nearest dollar, Penny calculated that the amount was $18,812.

[3]It seems that this amount was three cents off.  It should have been $2,257.07 (equal to $13,542.39 ÷ 6).

In his calculation of average monthly deposits for the year 2010, Penny generally included monthly deposits to the joint account for the first half of the year and did not generally include deposits for the last half of the year, even though the

deposits to this account fell to near zero during the last half of the year. Penny's method would nonetheless correctly estimate average monthly deposits for the year if during the last half of the year there was an increase in the deposits to Mr. Bell's account that corresponded to the decrease in deposits to the joint account. We are unable to determine that this assumption is incorrect because our trial record does not contain bank statements for Mr. Bell's bank account for the last half of 2010. If the Bells thought it was incorrect for Penny to assume that there was a corresponding increase in the deposits to Mr. Bell's bank account for the last half of 2010, they could have explained this to Penny. Alternatively, they could have given Penny the bank statements for Mr. Bell's bank account for the last half of 2010. This would have given Penny the opportunity to examine deposits into the three bank accounts during the same period. On September 12, 2010, the IRS Centralized Offer in Compromise Unit asked the Bells for bank statements for all of their accounts for the last three months. The Bells did not respond.

Alternatively, the Bells could have given Penny the statements for Mrs. Bell's account at the Bank of Kansas for the first half of the year. If Penny had had these statements, he would have had statements for all three bank accounts for the first half of 2011. At least initially, the absence of Bank of Kansas account

statements for the first part of the 2010 year was presumably due to the confusing nature of two of Penny's inquiries. On July 9, 2010, he asked the Bells for bank statements from the Bank of Kansas for the last six months of 2010. On August 3, 2010, Penny again asked the Bells for bank statements from the Bank of Kansas for the last six months of 2010. As of the dates of the requests, the bank statements for the last half of 2010 did not exist. Penny ended up estimating the deposits to the Bank of Kansas account using five bank statements of that account for May, July, August, September, and October 2010, even though he had estimated deposits to the other two accounts using bank statements for the first half of 2010. If the Bells thought that relying on these months' statements would result in an inaccurate estimate, they could have given Penny Bank of Kansas statements for the first half of 2010. There were opportunities for the Bells to do so. Penny's letter of June 9, 2010, asked the Bells for their bank statements for the most recent six months. On November 19, 2010, Penny wrote a letter asking the Bells why the total of deposits recorded on the bank statements he had was so high. On January 7, 2011, Penny asked Mr. Bell the same question in a telephone conversation. On January 21, 2011, Penny wrote a letter asking the Bells to explain "why the average deposits are greater than income you are reporting" and asked them for bank statements to support their explanation.

Given the Bells' refusal to explain how their deposits changed over time or to give him bank statements from all of their accounts in the same timeframe, Penny did not abuse his discretion in rejecting the Bells' $4,800 offer-in-compromise.

4. <u>Conclusion</u>

The Office of Appeals' determination affirming the levy notice against the Bells for 2005 is sustained. The IRS may proceed by levy to collect the liability.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.